HENRY G. BORCHER, APPELLEE, V. CATHERINE McGUIRE; MARY O'DONNELL ET AL., APPELLANTS; DAVID W. BURKE, APPELLEE.

FILED DECEMBER 23, 1909. No. 15,788.

1. Guardian and Ward: FINAL SETTLEMENT: RATIFICATION. The final settlement of a guardian with his ward, made in the proper court, after the ward has attained his majority, where full disclosures of the acts of the guardian have been made and the facts are known to the ward, the ward has accepted and receipted for his distributive share of the estate in the hands of the guardian and requested the discharge of the guardian, is, in the absence of fraud or misrepresentation, a ratification of his acts.

2. ——: ——: ——. In such case the knowledge of the ward that a portion of the funds received by him was the proceeds of the sale of his land in partition proceedings would be a ratification and affirmance of such sale, and it would make no difference whether the partition proceedings were regular, voidable or void.

APPEAL from the district court for Cuming county: GUY T. GRAVES, JUDGE. Affirmed.

T. J. Mahoney and J. A. C. Kennedy, for appellants.

John J. Sullivan, P. M. Moodie and Henry M. Kidder, contra.

REESE, C. J.

This is an action to quiet title to the northeast quarter of the southeast quarter, and the southeast quarter of the northeast quarter, of section 18, township 24 north, of range 7, in Cuming county. The land originally belonged to James O'Donnell, who occupied it as the homestead of himself and family. He died testate in July, 1893. He left surviving him his wife Catherine, and his three minor children, Mary, John and Lizzie. His will was duly probated. By it, in a residuary clause, he devised the land above described to his widow and children in equal shares

of one-fourth each. In December, 1893, his widow married Alvin B. McGuire, who took up his residence upon the premises with the family. In October, 1904, Catherine McGuire, the mother of Mary, John and Lizzie, filed her petition in the district court, alleging the ownership of the land to be in herself and the three children, and praying for partition thereof. A summons was issued to the children, all of whom were yet under 14 years of age, and the same was personally served upon them, as stated in the return of the sheriff, by reading and delivering to each of them a true and certified copy of the original, and on A. B. McGuire, the "person having charge and care of said minors, with a true and certified copy" thereof. A guardian *ad litem* was appointed, who filed his answer, and such proceedings were had as resulted in a judgment in favor of Mrs. McGuire, and ordering a partition of the land and the appointment of three referees to make the division. The referees subsequently reported that, if the land were divided, the separate interest of each owner would be of little value, and recommended the sale of the property, which they appraised at $2,000. The court then ordered the sale of the land. After an abortive sale to Catherine McGuire, the referees readvertised the land and sold it to David W. Burke for $2,080. The sale was confirmed, and the referees were directed to convey the property to the purchaser, which was done, and Burke obtained possession. A partial distribution of the proceeds of the sale was made in 1896, but as the land was sold on time, less a certain amount paid in cash, the portion or distributive share of the minor children was withheld to be paid out of the proceeds of the deferred payments. Later, about February 27, 1903, Burke sold and conveyed the premises to the plaintiff, Henry G. Borcher, who went into possession, and later instituted this suit for the purpose of quieting his title, making Catherine McGuire and the three children, who had attained their majority, defendants. Catherine McGuire tendered no defense and a default

was entered against her. A decree was rendered in favor of plaintiff from which the three children appeal.

From the pleadings, evidence, briefs and arguments, it is shown that the three children of James O'Donnell claim that the procedings in partition were and are void for the following reasons:  (1) That the service of summons upon them in that action did not give the court jurisdiction, they being at that time minors under the age of 14 years; (2) that the court in that proceeding rendered no judgment confirming the shares of the respective parties, as owners of the premises, and that in the absence of such judgment all proceedings to partition or sell were void; (3) that there was no bond given by each of the referees, and that, owing to this fact, their sale was without authority of law, and void.  On the part of plaintiff these legal propositions are combated, and it is asserted that during the minority of appellants a guardian was appointed for them who received the proceeds of the sale, and that after appellants had attained their majority they had a settlement with their guardian, and received their several distributive shares of the proceeds of the sale, and are thereby estopped to claim the land.

The attack upon the service of the summons is based upon the fact that the delivery of a copy thereof to A. B. McGuire, the stepfather, was not a sufficient compliance with section 76 of the code, which provides: "When the defendant is a minor under the age of fourteen years, the service must be upon him, and upon his guardian or father; or, if neither of these can be found, then upon his mother, or the person having the care or control of the infant, or with whom he lives.  If neither of these can be found, or if the minor be more than fourteen years of age, service on him alone shall be sufficient.  The manner of service may be the same as in the case of adults."  As we have seen, the father of appellants was deceased.  There was no guardian, the guardian having been subsequently appointed.  Their mother was the plaintiff in the suit, and, so far as that case was concerned, their adversary;

and, unless we adhere to the strict letter of the statute without reason, it would have been an idle form to serve a summons upon her.  Again, were we to hold that service on her was essential, her relation to the case would probably be sufficient.  It cannot be denied that the proper and legitimate course suggested by the conditions then existing would have been to defer the commencement of the suit until the appointment of a general guardian could be effected and service made upon him.  Both reason and ordinary caution would have suggested that course.  This, however, was not done, and the service had upon the step-father whose interests, it may be inferred, were with those of the plaintiff in the action.  At the time of the trial the sheriff who made the return of the summons was deceased, and two of the appellants testified that no copy of the summons was ever read or delivered to them.  Were it not that we will have to affirm the decree upon other grounds, we would deem the question of the legality of the service and proceedings thereunder as a very serious one.

As we have suggested, it was alleged in the amended petition that a general guardian was finally appointed for appellants; that after the sale and collection of that part of the purchase price to which they were entitled had come into his hands, and after they had attained their majority, the guardian had made his final settlement with them, and paid them their distributive share of their father's estate, including the amount received for this land; that they accepted and retained the same; and that their guardian had been discharged.  To this part of the amended petition appellants in their answer allege that they have never knowingly received from their guardian any portion of the proceeds of the sale, or that the funds or property received by them from him was in any way derived from the sale of said property; that, if it should appear upon an accounting that such was the case, they offer and tender to pay to the person entitled thereto the full amount thereof.

Upon the trial three receipts were offered and admitted in evidence, the signatures of appellants being stipulated to be genuine. They were as follows: "(a) In the county court of Cuming county, Nebraska. Received of F. J. Wiesner, guardian of the minor heirs of the estate of James O'Donnell, deceased, the sum of $571.38 in full payment and satisfaction of my distributive share and all of said estate, together with interest and all accumulations thereon, and I hereby consent that said guardian may be discharged from his trust, and I hereby declare that I am above 21 years of age. Dated this 15th day of September, A. D. 1904. John O'Donnell. In presence of O. E. Engel. (b) In the county court of Cuming county, Nebraska. Received of F. J. Wiesner, guardian for the minor heirs of the estate of James O'Donnell, deceased, the sum of $571.38 in full payment and satisfaction of my distributive share as an heir of said estate, together with interest and accumulations thereon, and I hereby consent that said guardian may be discharged from his trust, and I hereby declare that I am above 21 years. Dated this 15th day of September, 1893 (?). Elizabeth O'Donnell. In presence of O. E. Engel. (c) In the county court of Cuming county, Nebraska. Received of F. J. Wiesner, guardian of the minor heirs of the estate of James O'Donnell, deceased, the sum of $571.38 in full payment and satisfaction of my distributive share of said estate, together with interest and all accumulations, and I hereby consent that said guardian may be discharged from his trust, and I hereby declare that I am above 21 years of age. Dated this 15th day of September, A. D. 1904. Marie O'Donnell. In presence of R. F. Kloke."

It was admitted that these receipts were a part of the files of the county court of Cuming county, and conceded that the money was paid to appellants at the time stated. It is contended that at the time they did not know that the money was the proceeds of the sale of the land, but the admissions in their testimony clearly show that they knew the land had been sold to Burke; that he had gone

into possession, and that the family were out of possession and had been since 1896. The proofs show that the land sold by the referees to Burke brought, at least approximately, its fair value at the time of the sale. In his testimony on examination in chief, appellant John O'Donnell testified that at the time he received the money from the guardian on settlement he did not know that it included any part of the proceeds of the sale of the land, but upon cross-examination he weakened the force of his former testimony somewhat. We quote a part of his cross-examination: "Q. How did you come to call on your guardian for this money? A. Why, he wrote me about it. Q. And the only information you had about the amount of money that was coming to you was obtained from your guardian? A. Yes, sir. Q. Did he explain where it came from? A. No, sir; he didn't. Q. You mean that you settled up after you were 21 years old without knowing where it came from? A. Yes, sir; I do. Q. I suppose you knew in a general way that the money in your hands had come from the sale of the property left by your father. Was that your understanding? A. I didn't have any understanding about it. Q. Where did you think, John, that money came from, think it dropped out of the sky? A. No, sir; I understood that there was personal property and so forth. Q. Did you understand that there was land? A. Yes, sir; a part of it. Q. What did you suppose had become of the money for that land? A. No, sir. Q. Didn't it interest you the least bit enough to think about it? A. Yes, sir. Q. Why did you say, John, that you believed part of it came from the personal property, and that you didn't know part of it came from the land? A. I said I supposed part of it came from the personal property and part of it might have come from the land, I didn't know. Q. But you made no inquiry? A. No, sir. Q. So you took the guardian's word and settled with him? A. Yes, sir. Q. Understanding that the money you were getting from the guardian was your share of your father's estate? A. I supposed it was. Q. Derived from

the sale of the personal property and the land? Give a receipt? A. I suppose I did. I don't remember."

Mary O'Donnell, one of the appellants, was called as a witness by plaintiff. After stating that some land in Kansas belonging to her father's estate had been lost by the nonpayment of taxes by those in charge of the estate, she was asked: "Then you knew that none of the money you received came from the Kansas land? A. Yes, sir. Q. All came from the Cuming county land? A. That and papa's personal property. He left considerable personal property. Q. You stated a moment ago that you knew in a general way? A. Yes. Q. How many farms did he leave in Cuming county? A. Two. Q. You knew they were both sold? A. Yes, sir. Q. You knew, of course, that the money you received was the proceeds of the personal property and the farms that were sold? A. Yes, sir."

The deposition of the other appellant, Lizzie O'Donnell, was taken and read in evidence by defendants. In her examination in chief, with reference to the matter of her settlement with her guardian after she became of age, she stated, in substance, that she did not then know, and was not informed, as to the source from which the money paid her was derived, but that she did understand that the general source was from her father's estate; that she did not know that any of it "came from the sale of the old home place", and had no knowledge of any defects in the proceedings for partition, but that she knew that the land in dispute had been sold. She, doubtless, also knew that Burke was the purchaser and had long been in possession.

As to the accounts rendered by the guardian upon the final settlement, there is an unsatisfactory stipulation showing certain receipts, but no copy of the account is before us. While it appears that the final settlement was, probably, made in the county court, the parties being present, there is no transcript of the proceedings in that court among the papers or in the record. If the

guardian practiced any fraud or withheld any information or funds, the proof of the fact must be found outside of the files of this case. Under these circumstances we are constrained to hold that the receipt of the money as the distributive share of appellants, and the discharge of the guardian at their request after they had become of age, was a ratification of all that had been done in the sale of the property, and that they cannot now question its regularity or legality. It is quite probable that, had the proceedings in the partition suit been attacked by direct proceedings, the judgment and orders in the case might have been reversed; or, possibly, had a collateral attack been made thereafter, unincumbered by any ratification and receipt of the purchase price after appellants had attained their majority, the result might have been different. We think they foreclosed their right by that act. It would be against equity to permit them, in the absence of any fraud or deception practiced upon them, to receive and hold the proceeds of the sale until the land increased in value, and then elect to disaffirm and offer to return the money received after attaining their majority, while, had the property depreciated in value, no such reciprocal right would have existed in favor of plaintiff or his grantor.

*Handy, Trustee, v. Noonan,* 51 Miss. 166, was where a sale of real estate, which had descended from a deceased father to his minor children, had been made by their guardian under a decree of the probate court ordering the sale. It was conceded by all parties, and decided by the court, that the sale by the guardian was void and did not divest the heirs of their title. It is shown, however, that after the heirs had attained their majority they appeared in the probate court on the day of the final settlement with their guardian (his account containing as one of the debits the proceeds of the sale), and accepted the account and settlement as correct, and the court held: "An acceptance by the heir or ward, after attaining majority, of the purchase money of land sold under a void

probate decree, is a confirmation of the sale, in the sense
and to the extent of working an estoppel in equity against
an assertion of the legal title."

*Candy, Adm'r, v. Hanmore,* 76 Ind. 125, was where a
guardian had made his final report which had been ac-
cepted and approved by the court having jurisdiction,
and the ward executed a receipt for the amount found
due, and the guardian was discharged. The guardian
afterwards died, and suit was brought against his estate
for funds alleged to have been in his hands, and receipted
for, but never paid. The evidence tended strongly to
sustain the allegations of the plaintiff, and the trial court
decided in her favor, but the judgment was reversed by
the supreme court. The contention of the appellant, de-
fendant, was that the finding and decision of the trial
court were contrary to law. In the opinion of the court
is is said: "It is agreed by the parties, and fully proven
by the evidence, that the deceased made his final settle-
ment as such guardian, reported it to the proper court,
that it was approved and the guardian finally discharged
by the court, in March, 1868. This claim was embraced
in, and finally adjudicated upon, in that proceeding, and
appellant cannot now maintain a collateral suit to re-
cover the same thing. Therefore, the finding of the court
was contrary to law, and a new trial ought to be granted."
See, also, *Briscoe v. Johnson,* 73 Ind. 573; *Holland v.
State,* 48 Ind. 391; Wells, Res Adjudicata and Stare
Decisis, secs. 425, 426; 1 Freeman, Judgments (4th ed.)
sec. 319a; *Seward v. Didier,* 16 Neb. 58; *Wamsley v.
Crook & Hall,* 3 Neb. 344; *Mote v. Kleen,* 83 Neb. 585;
*Deford v. Mercer,* 24 Ia. 118, and note; 21 Cyc. 140.

Holding, as we do, that the settlement of appellants
with their guardian, upon a full disclosure of his acts,
the receipts for their shares of the estate, with request
for the guardian's discharge, and his final discharge, was
a ratification of the sale, it becomes unnecessary for us
to inquire whether the sale was legal, voidable or even
void, as those questions do not become material.

Appellants, by their answer, caused David W. Burke, the purchaser at the partition sale and the grantor of plaintiff, to be brought in as a party to the suit, for the reason that he held a mortgage on the property executed by plaintiff, and the cancelation of the mortgage was sought. Issues were formed substantially as in the main case; but, as the sustaining of plaintiff's title leaves the mortgage valid, that part of the case need not be further noticed.

It follows that the decree of the district court must be affirmed, which is done.